Mr. Lee. Thank you, Your Honor. May it please the Court, my name is Bill Lee and together with my partner, Louis Tompros, I represent CISCO. CISCO commenced its declaratory judgment action to address allegations of infringement that have been made by TR Labs against CISCO's customers. Mr. Lee, right at the very front of your opening brief, you have a long list of pending litigation brought against CISCO's customers. Has CISCO intervened in any of those actions? No, Your Honor, what happened was this, and there's a reason for it and I'd give you the answer to that question. We have not moved to intervene. At the point in time when we brought the declaratory judgment action, there were four cases pending. One was in the midst of Markman proceeding to the other earlier stages. We brought the declaratory judgment action because in addition to those four, other customers had received letters of threat. We brought the declaratory judgment action and then immediately after it was dismissed, there were additional lawsuits filed against seven customers. But those four were already in an MDL, correct? So the likelihood that anybody else that got sued was going to end up in the MDL was pretty high. The MDL, Your Honor, occurred after the declaratory judgment complaint was filed and dismissed. So after it was dismissed, before it was MDL? We were dismissed before the MDL was ordered. After the dismissal, why didn't you then seek to intervene? Your Honor, that is Judge Wallace's question and the answer to it is simply this. We thought about it and we were quite sure that if we had moved to intervene in any of the individual cases, that what we would have gotten is an argument that we were gaming the system by trying to avoid addressing explicitly the declaratory judgment ruling of the district court before this court and instead trying to end run the proceeding by moving to intervene. But intervention is a much lower standard, isn't it? It is, Your Honor, but it was a decision that we made because we had this issue before the court. And what has happened, which goes to your question, Judge Wallace's question, is this. There were eight customers sued, four litigations. Then the declaratory judgment complaint is filed. It's dismissed. There are additional litigations, seven more customers sued. There are today now 14 of our customers sued. It has been MDLed. The MDL is in a position now where there's been a first Markman proceeding. There is a second Markman proceeding going on now, and all discovery has been stayed until August, until that is completed. So if this court were to reverse, my expectation would be, and it went back to the district court, we would go to the MDL. We'd be part of the proceedings. It's a long answer, Your Honor. It's a long answer to Judge Wallace's question, which is we had two choices. One was to come to this court and get a resolution that says we have a right to adjudicate these issues or to move to intervene. I candidly was concerned that we would be met with an argument that we shouldn't be allowed to intervene. We tried once. We're trying to end run the system. And so we've come to this court. We come to this because of the MDL. We come to this court at a point in time where if we're allowed to bring our declaratory judgment, and if we went back to the district court, it would be amended now to include all of the 14 remaining customers, all of the patents that are an issue. But what's happened in this case, Your Honor, is precisely – I'm sorry. Do you have indemnification agreements with your customers? I would say two things. The indemnity issues were not before the district court. In part, as Your Honor knows, those are questions that take some time to work out. So there was nothing about indemnity before the district court. There's nothing in this record. In Eris, there was nothing on indemnity. The district court – I'm sorry. This court decided the issue without regard to indemnification. But we've since said in Arkema that it is relevant, that even the indemnification demands are relevant. Your Honor, there are – I think the best way to put this is, Your Honor, if we take Eris to Sara and the subsequent Arkema, the cases take a collection of factors. Indemnity might be one. If it were an issue, it's not. I'm not saying and I don't think we've said that any one of those factors is dispositive of analysis. But I think what we are saying is this. When the court has before it 14 different Cisco customers, hundreds of pages of claim charts, multiple lawsuits, and there are three things that are not in dispute, the complaints themselves identify the Cisco products by name, by product. Mr. Lee, let me just throw into that mix. Have any of your customers said, well, Cisco is a necessary party? No, not yet, Your Honor. Okay. Not yet, Your Honor. Now, but Your Honor, there's a practical reason for that. There are many circumstances when the issue that Judge O'Malley has raised of indemnity, warranty, are issues that get worked out after the primary dispute has been resolved. And I think many people think the same thing I do, that if you put them into the main dispute, it's at least a messy trial and it could be an ugly trial. Makes sense. Way more fun. No, way more confusing. Let's get into the weeds a little bit here. You say that the trial court was wrong to say it was premature to look at the claim charts, and I think your friend on the other side at least agrees with that proposition. But then when we look at the claim charts, there's one patent for which there is no claim chart, and then there's two patents where there are claim charts and they don't mention Cisco at all? Your Honor, let me take the second question first. If you take the 349, the 059, the 754, and the 880 patents, which are the primary focus of the dispute, there are at least two patents where Cisco is not identified. And in our declaratory judgment complaint, we didn't assert at the time that those are an issue. Those are the four that are for sure an issue. And as to all four of those, Your Honor, the claim charts look like the claim chart that is at A194-206. I'm sorry, what do you mean for sure an issue? I thought there were seven patents that you asserted. There are seven patents that issue, Your Honor, and here's how I break them into three categories, and it's a little hard to follow because of all of the cases. But you didn't argue to the district court, we have D.J. jurisdictions, but only as to part of our complaint? No, what we did, Your Honor, is we argued D.J. jurisdiction as to the patents that had been specifically identified as being infringed by Cisco's products. Now, at the time, some of the complaints accused them broadly, but the way they break down is this. The four that I just identified have claim charts that specifically identify Cisco products, Cisco products by name, they quote Cisco documents, and as Your Honor knows, some of them actually accuse Cisco. They describe the infringing network as Cisco. And give me the numbers that you're pointing to. Pardon? Which are the numbers that you're pointing to? 349-059-734-880. Okay. Now, the 505 patent, Your Honor, let me tell you what happened. Cisco had not been named in the claim chart, and in their responsive brief, their red brief, the representation made by TRLS is that Cisco was not mentioned. We filed our reply brief before this court, so briefing closed before this court. The next week, a claim chart was filed specifically identifying Cisco. This is, in my view, precisely the kind of thing that MedImmune, ARIS, Kisara, Akima are intended to avoid. Sort of jockeying the position on who's going to get to resolve what is fundamentally disputed between the two of us. There are two patents, Your Honor. The 379 and the 545, as to which there are no Cisco products accused. And if there are no Cisco products accused, we don't claim to have declaratory judgment jurisdiction as to them. As to the first four, which are in the record before the court, I think that... I'm sorry. So you're withdrawing your claim of DJ jurisdiction as to those last two patents? Yes, so those latter two, there's no accusation against Cisco as we sit here today. So they would not be the focus of the declaratory... Despite the general statements in the Colorado case? Despite the general statements. I think, Your Honor, the way I would look at it is the general statements in the Colorado case that identified the Cisco product, among other products, as infringing, taken together with the claim charts that go specifically and identify the specific patents and the specific claims, together with the characterization of things as a Cisco network, the quotation of documents, photographs, the diagrams, all are... It's that collection together which we say gives us declaratory judgment jurisdiction under Eris. Since you're withdrawing something here, I just want to make sure the record is clear. You said the 379 and the 545, but you meant the 543, right? Yeah, you're right. Okay. I couldn't read my own writing. Okay, go ahead. So I think, Your Honor, where this leads us is this. We suggest, as we do in our briefs, that the parallels to Eris are really substantial. And each of the claims that TR Labs has made has actually been addressed by this court. The first is whether it's premature. It's not. The second is, does the court have to adjudicate the issue of infringement in order for it to decide whether it's declaratory judgment jurisdiction? That would deceive the purpose of DJF, and it would put us right back where this court expressed concern in Arrowhead, where there could be scare, it's called Arrowhead, scare the customer and run tactics without the manufacturer being able to get in and litigate. I'm kind of worried a little bit about us getting into these claim charts because I see incentives for bad claim charts to avoid declaratory judgment actions at a precise time when we need better claim charts to provide more efficiency and earlier adjudication of key issues. I'm troubled by us making decisions based on whether you're mentioned in a claim chart or not. Your Honor, I think that if I can imagine a circumstance where we might be before you where the claim chart did not mention the manufacturer for precisely the reason that you identified, which is to try to avoid declaratory judgment jurisdiction. That's not this case. If you compare this case to the claim charts in Arris, and these are documents submitted to the court making express accusations of infringement. And we wish those to be more specific and to come forward at an earlier time. And if we write this opinion that says, well, because they were specific and they came forth at an early time, we now have declaratory judgment. What are the implications of that? Your Honor, actually, I would suggest it is the right implication because what it does by requiring those specific charts early, by requiring the specificity which allowed us to come before you today, you'd be in a position to know who the real fight's with. And part of the reason for Arrowhead, part of the reason for Arris, part of the reason for Akima is this. The party who can most effectively get in there and litigate whether these different elements are satisfied by this product is us. If you look at the one claim chart that I just cited to the court, there is a reference to a Comcast network. Every single element is according to the plaintiff satisfied by us. So I think, Your Honor, the answer is you're right. Early claim charts are necessary. There should be more specificity. It actually joins issue. It prevents a lot of litigation over things that are extraneous. But when the claim charts such as the claim charts here demonstrate who the real fight's with, then the party with the real fight should be allowed to have the fight. Now, before I use my rebuttal, reserve my rebuttal time, let me just say one thing. Every single argument that has been made by TR Labs is addressed explicitly in Arris, Tessera, or Akima. The one argument that they have made and the district court relied upon is there's no evidence of pre-suit communications. To require pre-suit communications as a black-and-white rule would actually turn the MedImmune clock back. It would contradict footnote 11 in MedImmune that said the reasonable apprehension test is gone. And then, Your Honor, to go to your question, it actually would allow the patentee to manipulate the process by saying never talk to them, never made a direct accusation. This is a circumstance where if you look at the complaints, look at the claim charts, look at the 15 customers who've been sued, there is no doubt that as to our products, the fight is with us and we should be the people who are allowed to have the fight. I'll reserve the remaining minute for my rebuttal. Thank you, Mr. Lee. Mr. Summerfield. Thank you, Your Honor. May it please the Court, I'd like to pick up on the thread that Mr. Lee talked about, about the party with whom the real fight is with. And we have to look at what products are really at issue here. They're the building blocks for a telecommunications network. And in fact, all of the claims of all of the patents are directed to a telecommunications network, not the particular switching nodes that are manufactured by Cisco and the other companies whose products are the subject of our claims. The mention of Cisco throughout every one of those complaints is just gratuitous. No, it's not gratuitous, Your Honor, but those products are used to infringe, as are the products manufactured by Ciena and Juniper and Tel Labs and other manufacturers that are named throughout the charts. It's not just Cisco. But you've got a whole MDL where you've got all these parties. What's the big deal about having Cisco involved in that process as well? Well, the point is, Mr. Lee mentioned gaming the system. The declaratory judgment action, if they were allowed to bring it in California, meant they could take pot shots at all our patents with no ability on our part to counterclaim for direct infringement because Cisco doesn't make a telecommunications network or indirect infringement because we cannot allege the necessary state-of-mind requirements for either contribution or inducement. So they're basically allowed to say all these patents are bad and we cannot counterclaim at all. If they were to intervene in the MDL, at least we've got to counterclaim against their customers. We can't do that in California, which I believe is the reason they filed a case out there in the first place. Instead of intervening where, as Your Honor pointed out, the standard is much lower. And you're saying you wouldn't object to them intervening in the MDL? No, Your Honor, as long as it didn't result in the MDL being further delayed, which is another problem in the event that this court reverses and sends the case back to California because, as Mr. Lee said, they would probably be made part of the MDL. And if that happened, it would result in a necessary delay and whatever is left to do in the MDL, as Mr. Lee said, is already in the process of claim construction. When you were picking and choosing which Cisco customers to sue, did you go out and find certain Cisco customers that you felt were using Cisco products in non-infringing ways and exclude them from your list? No, Your Honor, it really wasn't like that. What we found were telecommunications networks that used the products of a variety of manufacturers that were configured in the ways that were covered by the claims. If they used Cisco products, those were named. If they used Siena products, those were named. If they used Telabs products, those were named. And so have you sued people that are not using Cisco? Yes, Your Honor, we have. There are customers that at least tell us we don't use any Cisco products or the products that we do use aren't used in the infringing configurations. As a matter of fact, in the MDL proceeding right this minute, we are working with the defendants to determine which products they really use and which ones they don't. But you're saying there's only one way to put the systems together if they're going to do it in a way that's compliant with industry standards. That's correct. For example, Your Honor, there's something called degree three configuration, which means there are basically three interfaces to the network. If a network doesn't have those, has only degree two, they're shaped in a ring, so there's only one interface coming in and one going out, that's not an infringement. We can't accuse that. And Cisco's products and the products of others can be used in those infringing configurations. So, in essence, Cisco says the rule fights with us. That's not really true. They're giving the building blocks to these companies, and the companies put them together as they want. Cisco has nothing to do with that. They don't make those design choices. The telecommunications companies do. But I understand that your argument in the MDL is not so much that they put them together as they want. They put them together as industry standards would dictate, and once they do that, it's necessarily infringing. That's not true, Your Honor. There are some limitations that are satisfied by the industry standards per se, or that are actually satisfied by the industry standards per se. But other things have nothing to do with industry standards. For example, do we configure our networks as a ring, or do we configure them as a mesh? There's no industry standard requiring mesh configuration. Yet, for a number of the patents, that is an element. So if they don't have a mesh, they don't infringe. Is the mesh more efficient than the ring? We believe so, yes, Your Honor. If we take a look at the claim charts that Cisco has cited to in their brief and look at the proposition that they've put forth, that there's absolutely no customer choice here, that their products are made to infringe. If we look at page A-164, for example, I can illustrate what we're talking about. Tell us what the differences are among the claim charts for each of the various customers, or are they substantially identical? For the different patents, Your Honor? Oh, they are different, and we can actually take a look at some of those. But, for example, the 880 patent deals with packet switching, which is what one would typically use for Internet communication. The other patents are directed to circuit switching, where there's a physical path through the switching node. That would have to do with, for example, voice traffic. So there are fundamental differences between the different patents and what they require. What about claim charts for the same patent, different customers? For different customers, they would be basically the same because the same four or five equipment manufacturers' equipment are being used by all of them. What evidence is there in the record for your proposition that you can't sue Cisco for contributory infringement? You suggested that's why you didn't come after them in the first place. Because of the customer choices that are required for these equipment designs. In other words, we would have to show that Cisco tells them, go do it this way. Configure your networks in this fashion. Not just that we provide you with the capability of doing... You would have to show that they know the patent and they intend to infringe it. But if you just told me it's more efficient to do it one way, wouldn't they be encouraging that efficiency and thus encouraging infringement? And you would have to prove the knowledge part. But why doesn't the record have evidence? What in the record shows that they cannot sue for contributory infringement? Well, again, Your Honor, I think it's just the fact that there are so many customer choices involved. And it would be essentially putting forth evidence to prove a negative. To prove that there is an absence of knowledge, for example. What customer choices are not mandated by standards? Let's take a look at page 164. And if we look at the very last element, it talks about a third network interface having third and fourth working ports. What satisfies that claim limitation? It says, depending on traffic requirements, the straddling span may have multiple working ports. For example, two such ports corresponding to the third and fourth working port requirements of this claim. That is the traffic demands of the customer. So that would be one that has absolutely nothing to do with industry standards. It's just where the customer seeks to put a node with these capabilities. If we look at page 166, here Cisco is talking about the Cisco transport controller. And it says, if you select automatic routing during circuit creation, the CTC routes the circuit by dividing the entire circuit route into segments based on protection domains. There's no requirement that the customer do that ever. It's something that Cisco offers, but it's up to the customer to decide to do that. It's not an industry standard. If we look at the next page, 167, the very last quote from a Cisco document, transport architectures, TDM-based mesh networks, are often large rings with a number of spurs or a series of rings that have become meshed over time as shown in figure one. In other words, the customer will take its ring-based networks and convert them to mesh. Again, a customer choice, not an industry standard. And in fact, if we look at the one reference manual that Cisco quotes in its reply brief at page six, it talks about, quote, commonly used network protection concepts. Again, not a standard, not a mandate, and entirely based on customer choice. So these are all things that the customer has the ability to choose. It's not Cisco's decision. Our fight is not with Cisco, and as a matter of fact, I would expect that if we got into a dispute with Cisco and we conducted a discovery, what they would tell us is, you have to go talk to our customers if you want to find out how their networks are configured. We can't tell you. Let me talk about the issue of the covenant not to sue. I thought it was interesting that you give me one email in the appendix or give us one email in the appendix when there's all this discussion about what was demanded and what wasn't demanded. Why didn't you show us the draft? Why didn't you show us the back and forth as opposed to just the one final email saying we can't agree? Because this was Cisco's fight, Your Honor. They're the ones that put forth the proposition that somehow this offer for a covenant not to sue was relevant. And all we thought was necessary to show the court, instead of burdening the court with lots and lots of paper, is a simple sort of summary of what happened. They wanted us to basically release their customers if any part of their system was covered by any element of any claim. In other words, they wanted a broad release for their customers if their products were in there in any fashion, even if those products were only used to satisfy certain limitations of certain claims of the patents that we asserted. It was just simply too broad. We were happy to give Cisco the release. We stand here today saying we have no basis for suing either for direct or indirect infringement. So you would give Cisco a covenant not to sue for direct or indirect infringement? Yes, and we offered to do that. The problem was the releases that they provided us said us or any third party, and they talked about any claim or any limitation of any claim. In other words, if there was a Cisco product in there that satisfied element A of a four-element claim, their customer would get a release. That's just too broad, and that evidence is nothing as far as whether there's a case or controversy between TR Labs and Cisco specifically. Mr. Semmerfield, at page 7 of your brief, you argued that this case is distinguished from Wolf and Harris because TR Labs' allegations against Cisco's customers identify, I'm quoting, identify the equipment of multiple manufacturers in addition to Cisco, and you made that argument a little bit anyway. Is there any authority that you can cite that allegations against other suppliers divest Cisco of an ability to bring a declaratory judgment action? Well, except for Harris itself, Your Honor. No, I can't think of another case where that was an issue. But the reasoning, it makes sense. I mean, what Cisco is saying is, and what the declaratory judgment plaintiff in Harris was saying is, look, this is all about our equipment and only our equipment, and the customer is really just a straw man here. If you have the equipment of multiple manufacturers that the customer chooses to use, then it's no longer a straw man. It evidences customer choice. So you'd have no problem if Cisco and the other manufacturers all joined in a declaratory judgment against your client? It would be the same problem, Your Honor. We couldn't accuse any one of them individually of direct or indirect infringement. They would still be able to assert invalidity, unenforceability, whatever else they chose, and we would have nothing to say in response because, as with Cisco, the other manufacturers don't directly infringe, and we see no evidence of the requisite state of mind to allow us to accuse any other manufacturer of indirect infringement. So we are stuck with a one-way litigation. So it's a tactical problem. It's also what we believe to be at the foundation of the requirement of a case or controversy. It basically puts us in a defenseless situation because we don't have a real dispute with any of them. It's their customers. And the way the customers choose to select equipment, to design the equipment, to implement the equipment, what features they choose to use, all of that is required to show infringement. And again, as with Cisco, if we were to sue any of them for infringement, my guess is that what we would learn in discovery was, we can't tell you how these things are implemented by our customers. Go talk to them. Your Honors, I have a minute and a half left. I don't have anything else unless the Court has any other questions. Thank you, Mr. Summerfield. Let me briefly address four points in the minute I have. Your Honor, to clarify on this question of the two patents, we did assert declaratory judgment jurisdiction over them originally based upon the Colorado complaint. After the complaint was dismissed, I understand, we know that there have been claim charts that have been filed that don't identify us as to those two. We would assert declaratory judgment jurisdiction for the purpose of clarifying that judgment should enter for us on those. So those two are a little bit different than I described. They were encompassed in the broad allegations of the Colorado complaint. There have been events subsequent to the declaratory judgment action that might resolve them away. Wait, Mr. Lee, I think you're going way too far. So you're saying you want declaratory judgment jurisdiction that you can go in and say we're entitled to judgment of non-infringement because they've never alleged infringement. That's kind of hard to get a report on that. I think it's different. I was trying to clarify it temporarily, Your Honor. We did include those originally because the complaint, as Your Honor knows. So are you withdrawing them or not? Your Honor, right now the claim charts that we have before us don't accuse us of infringing. If we go back to the we're allowed to participate in a district court proceeding and if the way the claim charts work out as we proceed through discovery there's no claim against us, we're not going to be fighting with them about that. Mr. Lee, your time has expired, but you do, I think, need to give us at least a brief answer on the key point. You said the real fight's with us and Mr. Summerfield just spent his whole argument pointing out that most of these patents deal with consumer choices which have nothing to do with you. So you need to tell us again why is this fight with you? Your Honor, Mr. Summerfield's incorrect. Why is he incorrect? If Your Honor looks at most of what he quoted to you, they are actually quotes from Cisco documents. They are documents that actually, in the other cases Your Honor has had before this court, are exactly the type of documents used to show that someone has induced infringement because the manuals describe performing the specific method. So what Mr. Summerfield has done is taken quotes. So, for instance, if you take A-166, the if you select the routing, then you can use the Cisco transport controller this way, that's a direct quote from our document. That is exactly the type of evidence this court has considered. That is evidence not necessarily sufficient, but evidence of inducement. This case is actually indistinguishable, to go to Judge Wall's question, from Eris. Eris was a network claim as well. But now we're getting into proving infringement to prove your jurisdiction. Isn't that a little backwards? No, actually, Your Honor, it would be if that's what we were doing. It's a motion to dismiss. Then our allegation, made as a complaint, are supposed to get the benefit of the doubt. And in fact, the district court here said, as she said explicitly, there could be jurisdiction, there might not be jurisdiction. On a motion to dismiss, that should be resolved in our favor. On the claim charts, if you have an exact quote from a Cisco document, that is evidence not of customer choice, but actually it's evidence that they will use to suggest, that people would use to suggest, that we have invited, instructed. But they're standing here saying, they'll give you a covenant not to sue for indirect infringement. Your Honor. Why not take that? They wouldn't. And here's the reason. They wouldn't. He just said, he'd be in big trouble here, officer of the court. He just told us he would. We'll go back and talk to him, Your Honor, because here's the reason you only have the one email. The dispute that was between us is actually the dispute captured in that email. And the email says, we won't release your customers. Why didn't you respond and say, that's not what we're asking for? The email says, they won't give us the covenant. The disagreement was this. They will not give us the covenant that would have the effect of benefiting our customers. If there's no indirect infringement claim, and the last iteration of the draft that was changed had nothing about the customer, explicitly. It was one that would have released us from an indirect infringement claim. And then under Quanta, there would be exhaustion issues that occur. And they said, no way. So is this really that you're protecting Cisco from a threatened lawsuit, or is that you just want to litigate for your customers? No, actually, Your Honor, what we want to do is, if Your Honor looks at the claim chart I identified for you, we want to litigate whether for every single one of these elements, the Cisco products, the Cisco manuals that are described, satisfy those elements. Because they don't. Right, but you only have a case of controversy as to that if they can assert an indirect infringement claim against you. And, Your Honor, that's what Eris... Eris describes it as an implicit indirect infringement claim. No, but if he's standing here saying that they will give you a covenant not to sue for indirect infringement... Your Honor, I'll say two things to you. One is they have it. The second is, if they want to talk to us as we walk out of the courthouse today about an indirect infringement covenant that would protect us in the manner in which we think we're entitled to, and they'll take whatever exhaustion risk there is, we'll talk to them about that. We were willing to do that before. Yeah, I mean, maybe it's my district court hat that I'm still trying... I would stick you in a conference room right now if I could. But let us know if the case is moved, okay?  Thank you, Mr. Lee. Thank you, Your Honor.